565 So.2d 1040 (1990)
EVANGELINE FARMERS COOPERATIVE, Plaintiff-Appellant,
v.
Ted FONTENOT and Ronnie Fontenot, Defendants-Appellees.
No. 89-210.
Court of Appeal of Louisiana, Third Circuit.
June 27, 1990.
*1042 Dauzat, Falgoust, Caviness & Bienvenu, Steven J. Bienvenu, Opelousas, for Evangeline Farmers Co-op.
Lemle & Kelleher, Scott S. Partidrige, Francis H. Brown, New Orleans, for Monsanto Co.
Before DOUCET, LABORDE and KING, JJ.
KING, Judge.
The issues presented for review by this appeal are (1) whether the trial court erred in granting a motion for summary judgment; (2) whether the trial court erred in refusing to give a requested jury instruction; and (3) whether the jury erred in its apportionment of fault and assessment of damages.
Eugenel Fontenot and his two sons, Ted and Ronnie (hereinafter collectively referred to as the Fontenots), farm sweet potatoes in Evangeline Parish, Louisiana. In connection with their farming, they purchased some agricultural chemicals from the Evangeline Farmers Cooperative (hereinafter referred to as the Coop) in Vidrine, Louisiana. The Coop filed suit on open account against the Fontenots seeking payment for the chemicals sold and delivered. The Fontenots filed an answer to the suit and asserted a reconventional demand against the Coop for damages sustained due to a loss of a portion of their sweet potato crop. The Fontenots allege in their reconventional demand that the Coop was negligent in failing to deliver the specific chemical that they requested. As a result, the Fontenots applied an improper chemical to their crop which destroyed 133 acres of their sweet potatoes. The Coop filed a third party demand against Monsanto Company (hereinafter referred to as Monsanto), the manufacturer of both the chemical that the Fontenots requested and the chemical that the Coop actually delivered. The Coop's third party demand seeks indemnity and/or contribution based on the contention that Monsanto negligently placed into the stream of commerce these two chemicals which were packaged in a deceptively similar manner. The Coop contends that this deceptive labeling caused them to mistakenly deliver the improper chemical to the Fontenots.
Monsanto filed a Motion for Summary Judgment, and following a hearing on that motion, the trial court granted judgment in their favor and dismissed the Coop's third party demand. A formal written judgment was signed. The Coop timely appeals this judgment dismissing Monsanto from this lawsuit. The case proceeded to trial on the Fontenots' reconventional demand against the Coop. At the conclusion of the trial, the jury returned a verdict in favor of the Fontenots and against the Coop for the sum of $125,000.00. The jury found that the Coop was 75% at fault and the Fontenots *1043 were 25% at fault for the damage to the crop. The trial court signed a written judgment in accordance with the verdict of the jury reducing the Fontenots' recovery by their 25% comparative negligence and making a total award to the Fontenots of $93,750.00 plus legal interest and costs. The Coop timely appeals this judgment. The Fontenots have filed an answer to the appeal seeking an increase in the amount of damages awarded. We affirm.

FACTS
In 1986, the Fontenots farmed approximately 800 acres of land in Evangeline Parish, Louisiana. At the time of trial, Eugenel Fontenot stated that he had farmed sweet potatoes for the past 25 years. In 1986, the majority of the Fontenots' acreage was planted with sweet potatoes although they did plant a few acres of soybeans. To control weeds and grass in their sweet potato crop, the Fontenots used a herbicide known as Amiben on the majority of their acreage. When the Fontenots ran out of Amiben, on the advice of other farmers in the area and because the price was less, they decided to try the herbicide known as Lasso which is manufactured by Monsanto. The chemical Lasso is not labeled for use on sweet potatoes. The permissible uses of the product, as set forth on the box and in the enclosed instructions, are for weed control in corn, soybeans, peanuts, grain sorghum (milo), dry beans, peas, sunflowers, cotton and woody ornamentals.
On June 17, 1986, Eugenel Fontenot sent one of their farmhands, Michael Scott, to the Coop to purchase some Lasso to use on the Fontenots' sweet potato crop. The Fontenots had been buying chemicals from the Coop for approximately 25 years. During the years prior to trial, the Fontenots spent, on the average, $100,000.00 to $150,000.00 per year at the Coop. Eugenel Fontenot admitted that he knew that Lasso was not recommended for use on sweet potatoes yet he wanted to try it on his crop because other farmers were using it with success. Pursuant to Eugenel Fontenot's instructions, Scott traveled to the Coop and informed the clerk on duty, Joanne Fontenot, that he wanted to purchase some Lasso. When asked by the clerk if the Lasso was for use on soybeans, Scott replied that he was planting sweet potatoes. The invoice prepared by Ms. Fontenot evidenced that Scott, on behalf of the Fontenots, purchased 15 cases of Lasso. Ms. Fontenot gave the invoice to the warehouseman and told Scott to drive his truck around to the back of the building so the warehouseman could load the Lasso in his truck. Ms. Fontenot did not go back to the warehouse and supervise the loading as her job required her to do. Instead of loading Lasso as requested by Scott and as set forth in the invoice, the Coop warehouseman furnished the Fontenots with Lasso Atrazine, another herbicide manufactured by Monsanto. Scott took the Lasso Atrazine back to the Fontenots' farm where it was mixed and applied to 133 acres of their sweet potato crop.
Eugenel Fontenot testified that he was out of town when the Lasso Atrazine was mixed and applied. However, prior to leaving town, he had instructed his farmhand, Roy Serie, how to mix and apply Lasso. Roy Serie, who testified that he cannot read or write, mixed the Lasso Atrazine and applied it to 133 acres of the sweet potato crop. There is no dispute that no one read the labeling on the box or the enclosed instructions.
There is no dispute that the Lasso Atrazine, which is labeled for use on corn and grain sorghum (milo) killed the portion of the crop to which it was applied. On the other hand, had regular Lasso been applied to the crop, it is questionable whether or not any damage to the crop would have resulted. Two experienced sweet potato farmers testified that they have used Lasso to control weeds in their crops and that it was a very effective herbicide. However, sweet potatoes are not one of the crops for which Lasso is recommended for use.
The Fontenots have admitted that they did not read the Lasso Atrazine label or instruction booklet prior to applying the chemical. Eugenel Fontenot testified that he never reads the labels on herbicides *1044 because he relies on the Coop to advise him on the proper use of chemicals. Glen Johnson, the general manager of the Coop, acknowledged that it was common practice for the Coop to advise farmers on the use of agricultural herbicides. He also stated that he is aware that farmers rely on the recommendations of the Coop and consequently do not read the labels.
Eugenel Fontenot testified that about a week before he sent Scott to the Coop to purchase Lasso, he called either Glen Johnson or Jerry Laneaux, the Vidrine Coop branch manager, to find out how to mix and apply Lasso on his sweet potatoes. The Coop maintains that it did not know the Fontenots intended to use the Lasso on sweet potatoes and that it would not recommend the use of Lasso or Lasso Atrazine on sweet potatoes. The Coop concedes, however, that it mistakenly gave the wrong product to the Fontenots.
In its appeal, the Coop specifies three assignments of error which are:
(1) The trial court erroneously found no genuine issue of material fact to exist regarding Monsanto, and thus the decision to grant its motion for summary judgment was improper;
(2) The trial court erroneously refused to instruct the jury that a party is not entitled to lost profits for destruction of a crop which had just been planted before its destruction; and
(3) The jury committed manifest error when it found Evangeline Farmers Cooperative to be 75% at fault for the damages to the Fontenots' crop.

MOTION FOR SUMMARY JUDGMENT
The Coop argues that the trial court erred in granting Monsanto's motion for summary judgment because a genuine issue of material fact remains as to whether or not the labels on the Lasso and the Lasso Atrazine products are deceptively similar. Monsanto submits that the granting of their motion for summary judgment was proper because the Coop presented no evidence to support its contention that the products were packaged in a deceptively similar manner.
Articles 966 and 967 of the Louisiana Code of Civil Procedure set forth the guidelines by which Louisiana courts determine whether or not to grant a motion for summary judgment. Article 966 B states in pertinent part:
"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." (Emphasis added.)
The initial burden is on the mover to show that there is no genuine issue of material fact in dispute. Any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the mover and in favor of trial on the merits. Industrial Sand and Abrasives, Inc. v. L. & N R. Co., 427 So.2d 1152 (La.1983); Eldridge v. Bonanza Family Restaurant, 542 So.2d 1146 (La.App. 3 Cir.1989). Once the moving party has supported its motion for summary judgment with evidence sufficient to show no dispute as to material facts, the burden shifts to the party opposing the motion to respond by affidavits or other admissible evidence setting forth specific facts showing that there exists a genuine issue for trial. Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La. 1980); Huval v. Schmershal, 525 So.2d 140 (La. App. 3 Cir.1988). The party opposing summary judgment may not rely upon its pleadings and allegations. To the contrary, the non-moving party must affirmatively come forward with evidence placing material facts in dispute. Article 967 of the Louisiana Code of Civil Procedure provides in part:
"When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him."
*1045 In short, summary judgment law requires the non-moving party to go beyond the pleadings to successfully oppose a well-supported motion for summary judgment.
In support of its motion for summary judgment, Monsanto introduced the Lasso and Lasso Atrazine products, their respective boxes, and an affidavit of Kenneth E. Smith, Jr., the labeling manager at Monsanto. Smith's affidavit certifies that the Lasso and Lasso Atrazine boxes and instruction booklets which were introduced into evidence at the motion for summary judgment were true and correct copies of the type used by Monsanto at the time the Fontenots purchased the chemical.
The Coop provided the Fontenots with Lasso Atrazine. From the photograph which is made a part of the record, it is clear that the Lasso Atrazine box had a white background with primarily blue labeling except that the words Lasso and Monsanto are printed in red. The box conspicuously states that the product name is Lasso Atrazine. The box further provides, in blue print, that the chemical is a "selective herbicide for pre-emergence weed control in corn (all types) and grain sorghum [milo]."
The Fontenots ordered the chemical Lasso. Again, from the photograph which is made a part of the record, it is clear that the Lasso box also has a white background but has only red printing. The box clearly identifies the name of the product as Lasso. In red print on the box, it expressly provides that the chemical is an "emulsifiable herbicide for weed control in corn, soybeans, peanuts, grain sorghum [milo] and crops listed."
After carefully examining these two boxes, we agree with the trial court that these boxes are not so similar that the Coop could have been deceived by their labels. Although the style of print on the boxes may be the same, the different colors of print and the different layouts on the boxes make the two products easily distinguishable. We also note that the Coop is in the business of selling chemicals and therefore should not be confused by any similarities.
The Coop, other than its allegations made in the third party demand and deposition testimony contending that the boxes were similar, presented no evidence whatsoever which would place this fact in dispute. For example, no affidavits from any employees of the Coop were submitted stating that they were, on this occasion or any other occasion, deceptively misled by the similarity of the two products. No affidavit was submitted by the warehouseman, who mistakenly loaded the Lasso Atrazine in the truck of the Fontenot's employee, that his mistake was caused by the labeling on the two different products being deceptively similar.
Since we find that Monsanto met its burden of proving that no material issue of fact existed as to whether or not the labels on the products were deceptively similar, and since we find no evidence in the record submitted by the Coop to place this fact in dispute, we find that the trial court was correct in granting Monsanto's motion for summary judgment and dismissing the Coop's third party demand against it.

JURY INSTRUCTION
In its next assignment of error, the Coop contends that the trial court erred in refusing to give the following requested instruction to the jury:
"A party is not entitled to lost profits for destruction of a crop which had just been planted before its destruction."
Counsel for the Coop contends that this instruction was critical to the jury's determination of damages. Consequently, the Coop contends that the trial court's refusal to so instruct the jury constitutes reversible error.
It is well settled that adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3 Cir.1985), writ den., 480 So.2d 738 (La.1986). If the court gives misleading, confusing instructions or omits *1046 an applicable essential legal principle, then such instructions do not adequately set forth the law and may constitute reversible error. Marler v. Rent-It Co., Inc., 490 So.2d 784 (La.App. 3 Cir.1986).
The requested jury charge is taken from the case of Harper v. O'Neal, 363 So.2d 930 (La.App. 2 Cir.1978), writ den., 366 So.2d 561 (La.1979). In that case, the plaintiff, a farmer, plowed, irrigated, and fertilized his field in preparation of planting sweet potatoes. Sometime later, he planted 24 acres of sweet potatoes in the field. However, less than 24 hours after he planted these sweet potatoes, another farmer destroyed these sweet potatoes by plowing them up. At trial, the court refused to award plaintiff any damages for lost profits because the court found the plants were not a growing crop at the time of destruction. In support of its decision, the court noted that the potatoes had been in the ground less than 24 hours and that the field was still in the process of being planted. Id. at 932.
The Coop contends that although there may be a question of fact as to the time of planting and spraying, the jury should have been instructed that if they found the sweet potatoes were sprayed approximately twenty-four hours after planting, then the sweet potatoes had not yet become a "growing crop" and that the plaintiffs' damages, if any, should be limited to the cost of planting and should not include an award for lost profits. The basis of the Coop's position for this requested jury instruction is that sweet potatoes could not become a "growing crop" within twenty-four hours after planting.
The trial judge, in this case, refused to give the requested jury instruction taken from the Harper case because he found that case distinguishable, or not "exactly in point."
In this case, the uncontradicted testimony of plaintiff's expert, Dr. J.A. Foret, was that sweet potatoes actually begin to grow within hours after they are planted. Dr. Foret testified as follows:
"A.... The sweet potato is an unusual plant in that it's hyperactive, and I you mightI might tell the jury, it's hyperactive. You know what a hyperactive child is and the sweet potato plant is very much the same way because as soon as you cut it or break it or do anything at all toto move it around, it begins forming new roots and new shoots and they're growing. So if you cut that vine, the cell divisions begin immediately within the plant to form new roots.
Q. And the ...
A. And the plant is such thatthe nature of the plant is such that botanically it's considered probably the most active plant insofar as developing new roots and new shoots andor new organs, leaves and roots and shoots.
Q. And how long a period of time in your experience, uh, would, uh, the sweet potato plant begin growing after it has been planted?
A. I would say that, detectively, within hours. Under a microscope, we could find the roots beginning to form within hours after planting.
Q. And after, let's say, twenty-four hours?
A. Yes. You may see roots in twenty-four hours depending on what type plant was set out, what type plant part was set out. It may take a stem a little longer than aa slip with a shoot and roots on it already.
Q. Uh, and within, let's say, forty-eight hours, would you then ...
A. No doubt about it, you could find roots, yes, and not in my opinion, plant it in a warm soil with moisture, yes sir."
The testimony regarding the time lapse between the Fontenots' planting of their 133 acres of sweet potatoes and the application of the Lasso Atrazine varies from 24 hours to 4 to 5 days. No witness can recall exactly when the Lasso Atrazine was sprayed on the sweet potatoes. However, accepting Dr. Foret's uncontradicted testimony, we conclude that even if the Lasso Atrazine was sprayed on the sweet potatoes 24 hours after they were planted, the potatoes were still a "growing crop." *1047 Therefore, we agree with the trial court that the Harper case is distinguishable. We note that the trial judge in Harper apparently did not have the benefit of expert testimony regarding sweet potato growth or when they became a "growing crop." For these reasons, we find that the trial court's refusal to give the Coop's requested jury instructions was proper and does not constitute reversible error.

THE COOP'S NEGLIGENCE
Finally, the Coop argues that the jury was manifestly erroneous in finding it was 75% at fault for the damage to the Fontenots' crop. The Coop contends that the damage to the Fontenots' crop was caused solely by Monsanto's deceptive labeling and the Fontenots' failure to read the labels on the boxes of chemicals delivered to them. Because this court has affirmed the trial court's dismissal of Monsanto on its motion for summary judgment, the Coop's allegations of negligence on the part of Monsanto are moot. Therefore, we shall only consider whether the jury was manifestly erroneous or clearly wrong in its factual finding that the Coop was 75% at fault and the Fontenots were 25% at fault for the damage to the sweet potato crop.
In Rossell v. Esco, 549 So.2d 840 (La. 1989), the Louisiana Supreme Court reiterated the general principles governing an appellate court's power to reverse findings of a trial court or jury. The Court stated that:
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable....
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong ..." (Citations omitted; footnote omitted.) Rosell v. Esco, 549 So.2d 840, at pages 844-845 (La.1989).
After reviewing and considering the entire record in this case, with the above legal principles in mind, we conclude that the jury was not clearly wrong or manifestly erroneous in concluding that both the Coop and the Fontenots were negligent and apportioning their fault accordingly.
The testimony in this case reveals that the Coop admitted that it delivered the wrong chemical to the Fontenots. Obviously, the Coop's breach of its duty to *1048 insure that its customers receive the chemicals they request was a substantial factor in bringing about the damages suffered by the Fontenots. The Fontenots' crop died because they sprayed it with Lasso Atrazine rather than Lasso. Therefore, we find no error in the jury's conclusion that the Coop's negligence was a proximate cause of the Fontenots' damages.
We also find no error in the jury's conclusion that the Fontenots' own negligence was a proximate cause of their damages. Eugenel Fontenot testified that he did not read the label on the chemical before applying it to his crop. Furthermore, the Fontenots' farmhand who was responsible for mixing and applying the chemical could not read or write. Had either Eugenel Fontenot read the label on the chemical, which clearly identified the product as Lasso Atrazine, or had the Fontenots placed someone more responsible in charge of the critical process of applying chemicals to their crops, the resultant damages would not have occurred.
Finally, we find no manifest error in the jury's apportionment of fault. The testimony at trial revealed that the Fontenots had been planting sweet potatoes and doing business with the Coop for at least 25 years. Eugenel Fontenot testified that he relied on the Coop for advice on what chemicals to use and how to properly mix the chemicals. The manager of the Coop stated that he was aware that farmers often relied on them for advice and that they rarely read the labels on the chemicals.
Eugenel Fontenot further testified that before he sent his farmhand to the Coop to pick up the Lasso, he called someone at the Coop to find out the proper method of mixing Lasso. When the farmhand arrived at the Coop, he ordered Lasso, the order was prepared for Lasso, and an unsupervised warehouseman loaded the wrong chemical. Upon returning to the farm, the improper chemical was sprayed on the crop of sweet potatoes which destroyed the crop.
Eugenel Fontenot was not present on the farm when the chemical was mixed and sprayed on the crop. However, prior to leaving, he had instructed his farmhand to mix the chemical per the Coop's instructions to him for mixing Lasso.
In determining whether to sustain the verdict of the jury, we must consider whether its finding as to the percentages of fault were clearly wrong or manifestly erroneous. Thompson v. Colony Ins. Co., 520 So.2d 1158 (La.App. 3 Cir.1987). The proper factors to consider as influencing the degree of fault assigned to the parties are:
(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) How great a risk was created by the conduct;
(3) The significance of what was sought by the conduct;
(4) The capacities of the actor, whether superior or inferior; and
(5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985); Veazey v. Parish of Avoyelles, 476 So.2d 1057 (La.App. 3 Cir.1985), writ den., 478 So.2d 1236 (La.1985). The doctrine of comparative negligence is used to determine the damages available to each party when they are each found to have some degree of fault.
Given the circumstances in this case, we cannot say that the jury was manifestly erroneous in finding the Coop 75% at fault and the Fontenots 25% at fault for the damage to the crop.
In their answer to the appeal, the Fontenots urge this court to increase the jury's award of damages from $125,000.00 to $204,556.00, the latter figure representing the amount their expert figured as lost profits due to the 133 acres of sweet potatoes that were killed.
*1049 Before this court can disturb an award made by a trial court, the record must clearly show that the trier of fact abused its discretion in making its award. Ard v. Samedan Oil Corp., 483 So.2d 925 (La.1986); Charles v. Arceneaux Ford, Inc., 542 So.2d 846 (La.App. 3 Cir.1989). In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury and an award cannot be modified unless it is unsupported by the record. La.C.C. Art. 2324.1.
The jury was presented with contradicting testimony regarding the amount of damages or lost profits suffered by the Fontenots. In short, the Fontenots' expert, who calculated lost profits comparing the yield from a field of similar size and soil, arrived at a much higher figure than the Coop's expert who calculated the lost profits based on the farmwide yield.
Based on this evidence, we cannot conclude that the jury abused its discretion in weighing the testimony of each expert and arriving at its figure of damages for lost profits in the amount of $125,000.00.
For the reasons assigned, the judgment of the trial court is affirmed in all respects. All costs of this appeal are assessed to plaintiff-appellant
AFFIRMED.